**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
GABRIEL RAZZANO,

                 Plaintiff,

            - against -

COUNTY OF NASSAU, SALVATORE
MISTRETTA, WILLIAM LEMIEUX
and ANTHONY W. ROCCO,

                Defendants.
-------------------------------------------------------X

                         **REPORT AND**
                        **RECOMMENDATION**

                        CV 07-3983 (ADS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**    **PRELIMINARY STATEMENT**

       This case involves, *inter alia*, Plaintiff Gabriel Razzano's ("Plaintiff" or "Razzano")

claim under 42 U.S.C. § 1983 ("Section 1983") that Defendants County of Nassau, Salvatore

Mistretta, William Limieux, and Anthony W. Rocco (collectively, "Defendants"),[1] all current or

former members of the Nassau County Police Department (the "Department"), violated his

Fourteenth Amendment due process rights by failing to provide him with an adequate

opportunity to recover certain rifles and shotguns that Defendants confiscated from his residence

in March 2007. The guns are referred to as "longarms" because of the length of their barrels. In

a February 28, 2011 Memorandum of Decision and Order, Judge Spatt granted Plaintiff's motion

for summary judgment on his Fourteenth Amendment claim and ruled as follows:

---

[1]    Additional defendants were named in the Complaint, but were dismissed by Judge Spatt's
ruling on Plaintiff's motion to dismiss, DE 112, and motion for summary judgment, DE 164.

> Having determined that the plaintiff's Fourteenth Amendment due process rights were violated, the Court finds that the appropriate remedy for this violation is to order the defendants to provide the required process, as well as to pay damages, if incurred, for their delay in doing so. Thus, if Nassau County elects not to return Razzano's longarms to him, the Court directs the defendant Nassau County to hold a post-deprivation hearing regarding the plaintiff's longarms within thirty days of the date of this Order. As for damages – if any in addition to nominal damages – the Court respectfully refers this case to United States Magistrate Judge A. Kathleen Tomlinson for an inquest.

DE 164 at 28.  A hearing on damages relating to the retention of plaintiff's longarms was held on May 20 and May 25, 2011 (the "Damages Inquest").  DE 186.  After reviewing Plaintiff's letter motion for damages [DE 170], Defendants' opposition [DE 171], the parties' legal memoranda submitted prior to the hearing [DE 192 and 193], the evidence and testimony presented at the Damages Inquest, and the applicable case law, this Court recommends that Plaintiff be awarded a total of $20,000 in damages for the reasons that follow.

## II.    BACKGROUND

The facts of this case are set forth in Judge Spatt's summary judgment decision [DE 164]. The Court assumes familiarity with that decision and provides only a brief summary of the dispute.  Plaintiff is a resident of Freeport, New York, who was at one time politically active in the village with regard to a number of issues, including illegal immigration.  His activities included protesting and contacting legislators advocating for stricter immigration laws.  *See* Transcript of the May 2011 Damages Inquest at 43, 47, 137, 148.[2]  One of the legislators whom the Plaintiff frequently contacted was United States Representative Carolyn McCarthy.  Tr. at 59.

---

[2]    The facts set forth here are also referenced in the testimony of Plaintiff Razzano and other witnesses during the Damages Inquest held on May 20 and May 25, 2011.  The subsequent references to such testimony are designated "Tr. at __ ."

On March 19, 2007, the Plaintiff attempted to meet with Representative McCarthy, but was asked to leave her office, first by her staff, and then by the Nassau County Police Department Special Investigations Squad (who had been contacted by the Garden City Police). *Id*. at 224, 230. Subsequent to Plaintiff's visit to the Congresswoman's office, the Garden City Police learned that Plaintiff owned fifteen registered handguns and they contacted the Nassau County Pistol License Section who assigned Defendant Sergeant Mistretta and Officer William Lemieux to investigate whether Plaintiff's handguns should be confiscated. *Id*. at 218-219.

The next day, March 20, 2007, Sergeant Mistretta and Officer Lemieux visited Plaintiff's home, and upon discovering that he was not there, proceeded to his mother's residence nearby. Plaintiff's mother called the Plaintiff on the telephone and the Plaintiff met the police officers at his home shortly thereafter. *Id*. at 225, 226. Once inside, the officers confiscated Plaintiff's fifteen registered handguns as well as nine additional longarms. Nassau County does not have a license requirement for the purchase or possession of longarms. *Id*. at 233. Plaintiff Razzano was not arrested, but his pistol license was revoked. *Id*. at 236. Razzano, through his attorney, contacted the Nassau County Police Department on May 2, 2007 and made a formal request for an administrative hearing in order to set forth the facts he believed would result in overturning the revocation and the return of the longarms and handguns which were confiscated from the Plaintiff's home on March 20, 2007. *Id.* at 83; *see* Defendants' Exhibit A from the May 2011 Damages Inquest.[3] The Nassau County Police Department scheduled a hearing for October 31, 2007 and communicated that information in a September 14, 2007 letter to the Plaintiff. Tr. at

---

[3]     All subsequent references to exhibits introduced at the Damages Inquest are designated either by number for the Plaintiff or letter for the Defendants.

85-86; Defs.' Ex. B.  However, Plaintiff's counsel sent a letter dated October 1, 2007 to the Nassau County Police Department requesting that the "hearing on the merits of the pistol license revocation be adjourned *sine die* until after the resolution of the Federal action."  Defs.' Ex. C; Tr. at 90-92.

On September 24, 2007, Plaintiff filed this action challenging Defendants' seizure and retention of his longarms and asserting various causes of action including Plaintiff's Section 1983 claim for violations of his Fourteenth Amendment rights.  As noted, Judge Spatt granted Plaintiff's motion for summary judgment on that claim against all of the Defendants except Commissioner Mulvey.  Judge Spatt explained that Plaintiff's Fourteenth Amendment due process cause of action only involves the legal process that the Defendants afforded the Plaintiff after the longarms were confiscated, as opposed to the initial seizure of the longarms.  DE 164 at 14.  Judge Spatt found that the remedies available to the Plaintiff to recover his longarms, namely, a hearing before the Nassau County Pistol License Bureau or an Article 78 proceeding, were insufficient to protect Plaintiff's due process rights with regard to the longarms.  In addition, Judge Spatt further held that "persons whose longarms are seized by Nassau County are entitled to a prompt post-deprivation hearing" held in accordance with the parameters outlined by the Court.  DE 164 at 26-27.  By not providing this hearing, "Nassau County violated [Plaintiff's] Fourteenth Amendment due process rights."  DE 163 at 27.

Plaintiff's longarms were returned to him sometime after Judge Spatt rendered his decision and prior to the Damages Inquest.  Tr. at 78-79.  The purpose of this inquest is to determine Plaintiff's entitlement to damages, if any, caused by the lack of a prompt post-deprivation hearing and the Defendants' retention of Plaintiff's longarms since March 2007.

After Judge Spatt's decision on summary judgment, Plaintiff asserted an additional claim for violations of his Fourth Amendment rights relating to Defendants' alleged unlawful seizure of his guns. *See* DE 165. Unlike Plaintiff's Fourth Amendment claim "which addresses the legality of the defendants' initial seizure of his longarms, [the Fourteenth Amendment Claim] addresses only the legal process that the defendants offered him after those longarms were confiscated." DE 164 at 14. Thus, the only issue before the Court in this hearing is the amount of damages, if any, resulting from Defendants' violation of Plaintiff's Fourteenth Amendment due process rights. Specifically, the Court must determine Plaintiff's damages stemming solely from Defendants' *retention* of the long arms for four years without due process. Any damages relating to the *seizure* of the weapons, such as the alleged embarrassment or emotional distress related to the conduct of the search and the fact that neighbors/friends witnessed the search, go to Plaintiff's newly-asserted Fourth Amendment claim which is still being adjudicated.

## III.    DISCUSSION

Plaintiff is seeking $500,000 in compensatory damages and $500,000 in punitive damages based on the wrongful retention of his longarms. Tr. at 8, 12, 367. Plaintiff's counsel argues that in § 1983 cases, a plaintiff need not prove physical injuries to recover compensatory damages but may recover based on emotional injuries. *See* Plaintiff's Trial Memorandum [DE 193] ("Pl's. Mem.") at 1-2. Counsel goes on to note that emotional distress can be proved either by physical manifestations or by the Plaintiff's testimony corroborated by other testimony. *Id*. at 2 (citations omitted). However, Plaintiff's counsel further asserts that corroborating testimony is not always necessary and that the Court can also consider "objective substantiation

of humiliation and emotional distress on the part of the plaintiff." *Id*. (quoting *Lynch v. Town of Southampton*, 492 F. Supp. 2d 197, 205 (E.D.N.Y. 2007)).

As to punitive damages, Plaintiff asserts that such an award is warranted where, as here, "'there is a showing that the proscribed action has been a constant pattern or practice of behavior of defendants and that such practice has been willful and in gross disregard for the rights of plaintiff.'" Pl.'s Mem. at 5 (quoting *Urbano v. McCorkle*, 334 F. Supp. 161, 170 (D.N.J. 1971)). For support, Plaintiff relies upon Judge Spatt's finding that the Nassau County Police Department "has a policy of confiscating a person's longarms, at least when they believe a person to be dangerous" without a means of getting the longarms back. *Id*. (citing *Razzano v. County of Nassau*, CV 07-3983, 2011 WL 611594, at *7-8 (E.D.N.Y. Feb. 28, 2011)).

In Defendants' Memorandum of Law submitted in conjunction with the Damages Inquest, Defendants oppose an award of damages beyond nominal damages. Defendants' counsel contends that if the Plaintiff actually sustained any emotional distress caused by the County's retention of his longarms without a prompt post-deprivation hearing, "there is no evidence that plaintiff suffered anything other than 'garden variety' emotional distress." Defendants' Memorandum of Law Regarding Plaintiff's Demand for Damages at Inquest Arising Out of His Fourteenth Amendment Claim [DE 192] ("Defs.' Mem.") at 6. Defendants maintain that no emotional distress damages should be awarded, but add that

> if the Court is inclined to award emotional distress damages, such award should be no more than $5,000. . . . Even if the Court is inclined to exceed the $5,000 level, based on Second Circuit precedent, plaintiff should be awarded in the range of $5,000 and no more than $35,000, since in the "garden variety" emotional distress cases, awards hover in the range of $5,000 to $30,000.

*Id*. at 7-8 (citations omitted). Again, during his opening statement at the Damages Inquest, Defendants' counsel asserted that Plaintiff's subjective claim of emotional distress damages, without corroboration by a medical or mental health care provider warranted very low damages under Second Circuit law. Tr. at 15. However, during closing arguments, Defendants' counsel contended that Plaintiff is only entitled to nominal compensatory damages. *Id*. at 370.

Defendants' position with regard to punitive damages has always been that Plaintiff is not entitled to an award of punitive damages. *See* DE 171 at 4-5; Defs.' Mem. at 9-11. Given Nassau County's status as a municipality, Defendants argue no punitive damages can be assessed against the County. With regard to the individual Defendants, counsel asserts that there is no evidence that any of them "acted out of an evil or wrongful motive, or with malice, in retaining plaintiff's longarms without providing a prompt post-deprivation hearing." Defs.' Mem. at 10. Rather, Defendants maintain, Sergeant Mistretta, Officer Lemieux and Chief Rocco acted out of concern for the public safety and for the safety of the Plaintiff himself. *Id*. Against this background, the Court now turns to discussion of the specific categories of damages asserted.

### A.   Compensatory Damages

"It is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than a mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury." *McCann v. Coughlin*, 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus*, 435 U.S. 247 (1978)); *Kassim v. City of Schenectady*, 415 F.3d 246, 250 (2d Cir. 2005). "Absent a showing of causation and actual injury, a plaintiff is entitled only to nominal damages." *Miner v. City of Glens Falls,* 999 F. 2d 655, 660 (2d Cir. 1993). The burden is on the plaintiff to prove

each element of a § 1983 claim, including those elements related to damages. *Id.* In addition to out-of-pocket losses and other monetary harms, compensatory damages may also include "such injuries as impairment of reputation . . . personal humiliation, and mental anguish and suffering." *United Yellow Cab Drivers Ass'n., Inc. v. Safir*, No. 98-CV-3670, 2002 WL 461595, at *10 (S.D.N.Y. March 22, 2002) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).

Plaintiff seeks $500,000 for the following categories of compensatory damages: (1) "emotional distress damages including impairment of reputation, personal humiliation, reduction in quality of life, anxiety, loss of sleep, mental anguish, and suffering," and (2) costs associated with preserving his right to sue under the Pistol License Hearing, including legal fees of $2,500. *See* DE 170 at 2.[4] Prior to the May 2011 Damages Inquest, Defendants' counsel filed a letter with the Court objecting to the Plaintiff's demand for $2,500 in attorney's fees. *See* DE 183. At the Damages Inquest, Plaintiff's counsel stated that his client was seeking $2,500 in legal fees paid to counsel's law firm "to represent [plaintiff] in an Article 78 pistol license case which never came to be . . . ." Tr. at 8.

### 1. Emotional Distress

In order to recover damages for emotional distress, Plaintiff must "convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself." *Miner,* 999 F.2d at 662. "When a plaintiff seeks compensation for an injury that is likely to have

---

[4] Plaintiff's letter submitted in advance of the Damages Inquest stated that Plaintiff was also seeking the value of his firearms and lost wages. DE 170 at 2. At the Inquest, however, counsel for the Plaintiff confirmed that he was no longer seeking these damages. *See* Tr. at 15, 107-108.

occurred but difficult to establish, courts may roughly approximate the harm that the plaintiff

suffered and thereby compensate for harms that may be impossible to measure." *United Yellow

Cab Drivers Ass'n*, 2002 WL 461595, at *12 (awarding $250 for emotional distress damages)

(internal quotations omitted).

    The Second Circuit has stated the following regarding the evidence needed to support an

awards of damages for emotional distress in § 1983 cases:

> It is well-established that courts may award emotional distress damages in section 1983 cases. *Miner v. City of Glens Falls*, 999 F.2d 655, 662 (2d Cir.1993). However, the mere fact that a constitutional deprivation has occurred does not justify the award of such damages; the plaintiff must establish that she suffered an actual injury caused by the deprivation. *See Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The damage award "must be supported by competent evidence concerning the injury." *Id.* at 264, n.20, 98 S. Ct. 1042. A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. *See, e.g., Cohen v. Bd. of Educ.*, 728 F.2d 160, 162 (2d Cir. 1984); *Annis v. County of Westchester*, 136 F.3d 239, 249 (2d Cir.1998). *Cf. Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996). Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, *see Miner*, 999 F.2d at 663, or the objective circumstances of the violation itself. *See id.*; *Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir.1995). Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, *see, e.g., Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 581 (2d Cir.1989), is not required. *Miner*, 999 F.2d at 663.

*Patrolmen's Benevolent Ass'n of the City of the City of N.Y. v. City of N.Y.,* 310 F.3d 43, 56 (2d

Cir. 2002).

The Court finds that Plaintiff has presented sufficient evidence to support an award of emotional distress damages. In particular, Plaintiff was questioned at length regarding the differences in his life prior to and after he lost possession of his longarms in March 2007. The Plaintiff testified that prior to March 20, 2007, he attended regular meetings at Freeport Village Hall to make his position known with regard to illegal immigration and people congregating at various locations in Freeport. Tr. at 47. From 2001 onward, he organized protests at the Freeport train station and elsewhere to bring attention to the problem of day laborers "hanging out" on the street corners. He engaged in letter-writing campaigns. His activities brought him to speak to various news organizations such as Channel 12, *Newsday* and the local Freeport newspaper. *Id.* at 49-51. The plaintiff regularly visited Legislator David Denenberg's office and worked with Denenberg's aide, Kyle Strober. *Id.* at 53-54. He was also in frequent communication with New York State Legislator Charles Fuschillo and Congresswoman Carolyn McCarthy. *Id.* at 56, 59. All of this activity ceased as of March 20, 2007 when the police came to the Plaintiff's house and removed his firearms. According to the Plaintiff, because he had this outstanding issue with his firearms being taken and he wanted to get them back, and because he was told by the police officers "to cool [my] political activities," he never contacted these individuals from that time on. *Id.* at 56.

With regard to the emotional distress he claims he experienced as a result of his longarms being retained, the Plaintiff testified as follows:

Q.      And you turned over your longarms?

A.      Correct.

Q.      What happened next?

A.    When I got to one of my father's favorite rifles, I became choked up. I was very emotional.  My father loved his guns, took care of them, respected them. And when he passed away, they were entrusted to me to distribute amongst the family. And I feel that I failed my family.

*    *    *    *

Q.    Did you experience any physical manifestations after March of 2007?

A.    Physical - -

Q.    Did you experience anything?  Stress, for example?

A.    If it's physical, I believe it came from emotional - - you know, emotional buildup. I had trouble sleeping - - I'm sorry. I had trouble sleeping. I had a loss of confidence. I had trouble relating to my family members. . . .

Q.    How did you change your activities?

A.    I ceased to exist. I became very withdrawn. I was not outgoing anymore. Not as smily as I used to be.  I had a loss of confidence.  I'm a changed person.

*    *    *    *

Q.    . . . What did you experience after the police came and they took your guns and they kept your longarms?

A.    What was I experiencing physically?

Q.    No, as far as your mental anguish.

A.    I was depressed. Nightmares. I woke up this morning at 3:44 from a nightmare, and I've been up since. It has been affecting my sleep, my ability to find work and to do the work, to focus and to have the confidence to take on the task that I should be doing. I lost it.

*    *    *    *

Q.    Can you differentiate to the Court over how you felt over the loss of your pistols versus the results of the loss of your longarms?

A.    With the pistol, mom is still here, and I didn't feel that- - that emotional attachment with them.  As far as the longarms are concerned, what's been eating at me is that there's no possible way of getting them back.

*Id*. at 67, 68, 71, 72.

In December 2006, Plaintiff took his boat out of the water for repairs, but after March 2007, he became "consumed" with what had happened to him and to his longarms and he did not repair the boat.  *Id*. at 72.  Plaintiff also testified that prior to March 20, 2007, he would have run for trustee if he thought it was necessary to get his goals accomplished.  However, he does not feel that he could do that today because his "reputation is shattered."  *Id*. at 73.  When asked why, Plaintiff responded that "[b]ecause I had - - my longarms were taken under the guise I would be getting them back in 90 days, and now after this long of a time to go by, people looked at me as a criminal."  *Id*.

Regarding his personal relationships, Plaintiff testified as follows:

Q.    What about your relationship with other people?

A.    With other people?

Q.    With your mother, for example.

A.    Sorry. Once again, it's very emotional because of the ties, the sentimental value. And after losing my father's longarms, I withdrew. I withdrew from the relationship with my mother and withdrew from the relationship with my girlfriend.

Q.    Tell me about the relationship with your girlfriend, Margaret Hartwick.

A.    She's terrific. She's a real trooper. I love her dearly. But I wasn't there for her, and now I realize how consumed I was within myself that I couldn't be a good partner in any relationship.

*Id*. at 74-75.

On cross-examination, Defendants' counsel asked the Plaintiff how he could distinguish between the emotional distress involved in the taking of the firearms and the retention of the firearms. Tr. at 79-80. The Plaintiff responded that he believed he would get the handguns back in 90 days, so he had a chance of getting those back while his mother was alive. *Id.* at 81. However, Plaintiff stated that ". . . the longarms taken from me, that belonged to my father and belong to my family. They are not really mine. I believe that is what caused my emotional distress, the taking of the longarms and the realization they weren't coming back." *Id*. at 80-81.

With regard to his prior activities, the Plaintiff acknowledged that he did not need his longarms to attend civic meetings, or write to politicians, or organize political rallies. *Id*. at 97-100. Defendants' counsel further inquired whether the Plaintiff was claiming that his non-attendance at political activities led to his emotional distress. The Plaintiff responded "no" and stated that it was the retention of his longarms which led to his emotional distress. *Id*. at 101.

When pressed by Defendants' counsel about his claim for damages based on loss of reputation, the Plaintiff confirmed that his associates had never called him a criminal, but rather looked at him like he was a criminal. *Id.* at 110-111. Likewise, the Plaintiff was unable to identify anyone in his community to whom the Defendant police officers had spoken about Plaintiff's longarms being retained. Nor was the Plaintiff able to point to any newspaper article or electronic media in which he was mentioned concerning the retention of his longarms. *Id*. at 113. Further, the Plaintiff was unable to produce information or evidence to demonstrate that any of the Defendant police officers had described him as a bigot, a racist, or mentally unbalanced. *Id*. at 113-115.

Although the Plaintiff testified that these examples of his emotional distress pesisted over the years that his longarms were retained, he acknowledged that never went to see a psychiatrist, physician or mental health professional regarding his emotional distress. *Id*. at 93-96. In providing his reason, the Plaintiff testified as follows:

> Q.     Did you seek help from any of these types of professional?
>
> A.     No, I didn't.
>
> Q.     Why?
>
> A.     Because the defendants would use that against me in the return of the retained longarms. It took them - - because Detective Mistretta - - or Detective Samaniego, in his report, stated that I was psychologically unbalanced. And I feared that if I went to seek help for my problems, that this would be used against me in the return - - used against me to continue the retention of my firearms.

*Id*. at 125. Relating to this question about not seeking assistance from a mental health professional, Plaintiff's counsel introduced an April 24, 2007 letter from then Chief of the Nassau County Police Department, Anthony Rocco. *See* Pl's. Ex. 50. In that letter, Chief Rocco stated:

> This is to inform you that your Nassau County Pistol License has been revoked.
>
> This determination is based upon the totality of events which became apparent when you alarmed employees at Congresswoman Carolyn McCarthy's Office on March 19, 2007, causing this department to remove your weapons. Further investigation revealed that you have become increasingly obsessed with the day laborer situation and your actions cause great concern over your suitability to possess a pistol license. You have been named in six Freeport case reports demonstrating this pattern and interviews with you have raised concern over your conduct. Therefore, your pistol license is revoked for good cause.

*Id*.  Plaintiff received this letter a little over a month after his firearms had been taken from his home.  Tr. at 126.  The contents of the letter, according to the Plaintiff, caused him not to seek professional help for his emotional distress:

> Q.      . . . Mr. Razzano, in April 24, 2007, were you becoming increasingly obsessed with a day laborer situation?
>
> A.      On April 24th, which was well after - - a month after the incident.  I was absolutely shut down.
>
> Q.      Mr. Razzano, why were you concerned about your seeking help regarding your depression and your anxiety?
>
> A.      Because that - - I know these mental health issues are taken into account when you apply for a pistol permit, and when you go to purchase a longarm, new, they ask you on the form: Have you ever been treated for any psychiatric situation.

*Id.*  Nor did Plaintiff take any medication to ease his emotional distress, other than over the counter sleeping aids.  *Id*. at 95.

Plaintiff called several witnesses to corroborate his claim of emotional distress.  In accordance with the standard set out by the Second Circuit in *Miner* and *Patrolmen's Benevolent Ass'n,* this Court finds that these other witnesses have substantiated various aspects of Plaintiff's claimed emotional distress.  First, Plaintiff's mother, Helen Razzano, testified that the family "really treasured our guns" and she noted that at the time the longarms were taken by the police, her son "got a little choked up because the rifles, particularly, were his father's.  And his father has been dead a long time since that time, and it really meant a lot to us."  Tr. at 21, 25.  The mother's description of the humiliation her son suffered at the time the rifles were seized provides some necessary context here.  However, the Court looks more directly to Helen Razzano's  testimony concerning Plaintiff's asserted injury/emotional distress resulting from

Defendants' *retention* of the longarms.   When asked how Plaintiff had changed as a result of his

longarms being retained, Mrs. Razzano responded as follows:

Q.      Did you have a close relationship with your son?

A.      Yes. All my children. . . .

Q.      Again, if you can, did the relationship change because of the retention of the longarms?

A.      Absolutely.

                              *     *     *     *

Q.      How did it affect him?

A.      He became very withdrawn. And he was working on his boat; he has a workshop in my basement. Went down from the shop into the basement and did whatever he would do.  He was very industrious, was busy, very happy. He's always been a pleasure. He never caused me any problems, ever.

Q.      And how did that change as a result of the police holding onto his longarms?

A.      It changed because Gabriel changed. Gabriel became very depressed, I guess you would call it. He was quiet. He wasn't - - he didn't talk, and he didn't even come down anymore. I hardly saw him anymore. He just changed, and it was a terrible experience.

Q.      Did his activities change?

A.      Oh, yeah.  He no longer went to village hall like he did before, and he stopped. He stopped the boat.  The - - he stopped working on his boat. And it has been four long years now, and the boat has not been at the water. It's at the dry dock because he just is depressed, and that's it.

                              *     *     *     *

Q.      And was that related particularly to the retention of the longarms?

A.      Yes. Yes. He was perfectly happy before. We were all happy.  And it upsets me as a mother to see my children distressed like that. It upsets the siblings because they

16

don't want to upset him any more.  If they ask for  - - you know, my daughter has
been waiting for her rifle, and she hasn't gotten it yet.

*Id*. at 27-29, 31.

On cross-examination, Defendants' counsel asked:

Q.      You can't distinguish between how upset he was between the longarms and the
        handguns, can you?

A.      Yes. I would say yes. Because the longarms belonged to his father, who is
        deceased, because he gave it to him.  And he would be upset about that and the
        handguns. Of course he's upset about that.

*Id*. at 36.

Since approximately 1995, Margaret Hartwick has been the Plaintiff's girlfriend and she

testified in support of his claim of emotional distress.  Margaret Hartwick described the plaintiff,

prior to the incident of March 2007, as "carefree, easy-going . . . a man of principle."  *Id*. at 141.

Ms. Hartwick stated that the Plaintiff was very politically involved previously, liked to go to

Village Hall meetings, enjoyed boating and going out to dinner as well as going to the movies.

According to Ms. Hartwick, after the incident in March 2007, the Plaintiff did not go to the

marina anymore and did not attend village meetings.  She added that the Plaintiff was afraid of

being retaliated against.  *Id*. at 143.

When the Plaintiff did not get his guns back in 90 days, Ms. Hartwick testified that he

became preoccupied with this issue.  In describing the impact of the March 2007 incident on the

Plaintiff, Ms. Hartwick stated the following:

A.      . . . he would be up like all hours of the night, all hours of the night, worrying
        about whatever, trying to get the guns back. He was upset because, well - - it was
        very upsetting to him because he felt he let his family down with the longarms and
        everything. And he had a very hard time sleeping at night, very, very hard time
        sleeping at night.  He lost like 10, 15 pounds already. He really didn't eat that

17

much. He used to get headaches and things like that. He kind of stopped going out. Wouldn't go out that much. He didn't go to the diner anymore. He stopped doing the activities we enjoy doing. He used to go down to his mother's house all the time, made signs and things like that. When he would walk down the block, the neighbors would say stuff. They would joke around: "When are you going to get your guns back?"

                    \*      \*      \*      \*

Q.      You said he would be awake all hours of the night and couldn't sleep. How long did that go on?

A.      Well, it still goes on. It's been going on ever since this happened.

                    \*      \*      \*      \*

Q.      Did the retention of his longarms by the police department change anything?

A.      Yes, yes it did, because everything changed. Gabe became obsessed: How will I get this back. How will I get this back? And he owed it to himself to get this back. They were his father's. I mean, he wanted them. They were his possessions. He just - - he didn't know where to turn to.

*Id.* at 156-157, 158, 160. Hartwick further testified that she and the Plaintiff could no longer show the longarms to friends or take them to the shooting range, activities they also enjoyed. *Id.* at 154. People continued to make jokes about the situation, according to Hartwick, and that was part of the humiliation the Plaintiff experienced which led the Plaintiff to stop answering the phone. *Id.* at 164. He was unable to focus on anything, *id.*, would not pay attention to anyone, *id.* at 163, and was throwing up, *id.* at 172. With the passing of time, things just got worse according to Ms. Hartwick:

A.      He couldn't sleep at night, just like running in circles. And I couldn't be there for him either . . . it was hard on me too, hard for me to see him deteriorate all the time. There was nothing to do about it. I tried, I tried.

                    \*      \*      \*      \*

. . . As a matter of fact, as time went along, not only did he get worse, but I had to step aside from Gabe. I couldn't be there for him. I just couldn't be there as much as I wanted to be. I had to step aside. I couldn't do it. That put a burden on our relationship too.

*Id*. at 163, 164-165. With regard to Plaintiff's "obsession," Hartwick stated that he still feels the loss," *id.* at 162, and that his whole life has been put on hold for four years, *id*. at 168.

Kyle Stober, a legislative aide to Nassau County Legislator, David Denenberg, was also called as a witness by the Plaintiff. Stober testified that the Plaintiff had a history of writing letters to Legislator Denenberg on the topic of illegal immigration, an activity he previously engaged in beginning in 2006. *Id*. at 136-38. However, Stober noted that the letter writing stopped when Razzano "got thrown out of Carolyn McCarthy's office" in March 2007. *Id*. at 137-138.

The Court also heard testimony from Plaintiff's friend, Thomas Ferber. Mr. Ferber lived next door to the Plaintiff in Freeport for many years, but moved away in 2003 – four years before the incident underlying the Complaint. *Id*. at 41. Ferber testified that in the prior few years he saw Plaintiff boating less frequently, but he also testified that he himself boated less beginning in 2007, thus he would not have had the opportunity to meaningfully observe Plaintiff's boating habits. *Id*. at 41-42. Mr. Ferber also testified that Plaintiff was not as active in the community, but acknowledged that he himself was not as involved either, raising questions as to the basis for his opinion. *Id.* at 42. Based on the overall content of his recollections, the Court affords little weight to Mr. Ferber's testimony on the issue of Plaintiff's emotional distress based on the retention of his longarms.

Counsel for the Plaintiff, with the consent of Defendants' counsel, read into the record several passages from the July 10, 2008 deposition testimony of John Thomas Keane and his son, Christopher Keane – friends of the Plaintiff. Both men were in the Plaintiff's house at the time the handguns and longarms were taken by the Nassau County police in March 2007. *Id*. at 179, 184. Christopher Keane and John Keane detailed Plaintiff's removing the handguns and longarms from the large safe in the Plaintiff's house. *Id*. at 183, 185. While this activity was under way, John Keane advised the police officers that he had a valid pistol license and asked if he could take possession of the rifles and pistols. *Id*. at 181. The police officers told him no. *Id*. Both witnesses described the Plaintiff as crying and upset. *Id*. at 179, 185. According to both Keanes, the police officers told the Plaintiff that he would get his guns back after a 90 day cooling off period. *Id*. at 182, 186. Although the testimony of the Keanes may be relevant to the question of emotional distress damages relating to the *seizure* of the Plaintiff's guns, the Court finds that the testimony proffered does not address the issue of the *retention* of the longarms and, thus, is not properly considered here in the Court's analysis of emotional distress damages.

The Plaintiff also proffered another potential witness, Hank Wrobel. Mr. Wrobel is not a party to this action nor did he observe any of the incidents underlying this litigation. Plaintiff offered Mr. Wrobel to present testimony about his own experiences with the Nassau County Police Department regarding his longarms being retained. *Id*. at 213-214. Apparently, in December of 2004, the Nassau County Police Department seized Wrobel's pistols, longarms and air guns pursuant to an investigation involving the discharge of one of his handguns by his teenage son. *See* Pl.'s Ex. 57, ¶¶ 2, 3 (not admitted into evidence and provided here solely for context). The Court declined to permit Mr. Wrobel's testimony finding that the only damages

20

relevant to the hearing were Plaintiff Razzano's and that the proffer added nothing in support of the claim for emotional distress damages based upon the retention of the Plaintiff's longarms. Tr. at 214.

The Defendants argue that the Plaintiff cannot distinguish the effects of the retention of the longarms from the confiscation of the longarms or from the retention of his pistols. Taking the testimony of the Plaintiff and the supporting witnesses as a whole, the Court finds that although the Plaintiff may not be able to draw an exact line parsing out with precision how much of his emotional distress was caused by the retention of his longarms, the Court finds that the Plaintiff has introduced sufficient evidence supporting the conclusion that the retention of the longarms did cause Plaintiff emotional distress.

Having concluded that the Plaintiff has presented sufficient evidence of emotional distress, the next step is to determine what amount of damages is warranted. Emotional distress damages in the Second Circuit are generally grouped into three categories of claims: garden-variety, significant, and egregious. *See Thorsen v. County of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010). In garden-variety claims, the evidence of emotional harm "is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms." *Khan v. HIP Centralized Lab. Servs., Inc.*, No. 03-CV-2411, 2008 WL 4283348, at *11 (E.D.N.Y. Sept. 17, 2008). Significant emotional distress claims "differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* "Finally, egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct

21

or a significant impact on the physical health of the plaintiff." *Menghi v. Hart*, 745 F. Supp. 2d 89, 107 (E.D.N.Y. 2010) (internal quotations omitted). These three categories are general guidelines as opposed to bright line rules, and their utility is somewhat diminished by the fact that courts are not even in agreement as to what the labels mean. *Compare Thorsen,* 722 F. Supp. 2d at 293 (stating that significant emotional distress claims generally warrant damage awards between $100,000 and $500,000) *with Lynch v. Town of Southhampton*, 492 F. Supp. 2d 197, 207 (E.D.N.Y. 2007) (holding that an award in excess of $50,000 for significant emotional distress would shock the conscience); *see also Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 n.4 (E.D.N.Y. 2009) (noting disagreement among courts regarding appropriate range of garden-variety damages).

The Court finds that Plaintiff's claim of emotional distress falls somewhere on the continuum between "garden-variety" and "significant" and further recommends that Plaintiff be awarded $20,000 in damages. Notably, unlike the typical garden-variety emotional distress case, Plaintiff's testimony was corroborated in part by the testimony of Helen Razzano and Margaret Hartwick, and to a much lesser degree by Kyle Stober and Thomas Ferber.

There are several reasons why the Court believes Plaintiff is entitled to a far lesser amount of damages than the $500,000 he seeks. First, although Plaintiff was able to articulate a reason why the retention of his longarms was particularly distressing, there was also evidence in the record suggesting that Plaintiff's distress was caused in part by the *seizure* of the weapons itself as well as by the retention of Plaintiff's pistols. Second, the Court did not find some of the testimony regarding the more severe aspects of Plaintiff's mental distress, allegedly attributable to the retention of his longarms, to be reasonable. For example, the Court finds Plaintiff's claim

that he was still not sleeping and was having nightmares four years after the incident – and on the very day of the hearing – solely due to the Defendants' conduct in retaining Plaintiff's longarms, to strain the bounds of credibility and reasonableness. Likewise, Plaintiff's claim of total inability to work, *id*. at 108-109, once again based solely on the retention of his longarms is not reasonable for an individual in similar circumstances. The Court has already found that the Plaintiff did suffer emotional distress, but the degree of such distress attributable solely to the retention of the Plaintiff's longarms is not the completely disabling type Plaintiff has proffered to the Court – particularly without supporting evidence from a mental health professional. Finally, the Court also notes that some of the corroborating testimony, as well as some of Plaintiff's own testimony, was vague and conclusory.

In reaching the determination that Plaintiff is entitled to $20,000, the Court is guided by amounts awarded in other cases. Although the Court could not find a case involving these same circumstances, Judge Spatt's decision in *Lynch v. Town of Southampton*, 492 F. Supp. 2d 197 (E.D.N.Y. 2007), *aff'd by* 2008 WL 5083010 (2d Cir. Dec. 2, 2008), is instructive. There, the plaintiff Lynch brought a § 1983 action after her services as a dog walker were terminated and she was prevented from returning to the animal shelter where she volunteered after she wrote letters and otherwise protested the shelter's euthanasia policy. *Id.* at 200. After the jury awarded emotional distress damages in the amount of $251,000, Judge Spatt granted a remittitur and held that "an award for compensatory damages in excess of $50,000 would shock the judicial conscience." *Id*. at 207-08.

A comparison of the facts of *Lynch* to the facts of the instant case leads the Court to conclude that an amount significantly less than $50,000 is appropriate because the emotional

distress suffered by the plaintiff in *Lynch* was more severe than that experienced by the Plaintiff here. For example, Lynch took antidepressants for over a year and saw a psychiatrist. *Id*. at 207. Although Plaintiff Razzano explained his reasoning for not seeking assistance from a mental health professional, that is nonetheless a choice he made. In addition, Lynch's forced departure from the animal shelter was well covered by the media, and she testified that it affected her reputation and made her feel humiliated. *Id*. at 202-03. While there was testimony here about Plaintiff Razzano's humiliation and damage to his reputation, many of the statements were speculative and lacking in details. *See* Tr. at 73, 110-11, 113-15, 128-29, 143, 157-59, 164. The ability of both Lynch and the Plaintiff here to carry out an activity they were passionate about was affected by the conduct at issue. The Court may consider the "objective circumstances of the violation itself" in fashioning a damage award, *see Patrolmen's Benevolent Ass'n*, 310 F.3d at 55, and based on the objective circumstances here, the Court finds that the retention of Plaintiff's longarms for a period of four years and the release of those longarms only after Judge Spatt's decision in favor of the Plaintiff on the Fourteenth Amendment claim warrants an award of emotional distress damages to the Plaintiff, albeit in a much lesser sum than in *Lynch*.

Defendants argue that any emotional distress award should be reduced to account for Plaintiff's failure to mitigate his damages. Defs.' Mem. at 4; Tr. at 371-72. They argue that Razzano could have shortened the retention period by seeking to recover the longarms in a pistol license hearing in October 2007. This assertion, however, is speculative since there is no guarantee that the longarms would have been returned with the pistols or that the Plaintiff would have been successful at such proceeding. Judge Spatt held that neither a pistol license hearing nor an Article 78 proceeding sufficiently protected Plaintiff's rights under the Fourteenth

Amendment.  *See* DE 164 at 21-22.  Thus, Plaintiff's decision not to pursue an administrative pistol license hearing is not grounds to reject a damages claim.  Further, the Court notes that Defendants' suggestion that the administrative pistol license hearing was the appropriate mechanism for Plaintiff to secure the return of his longarms is inconsistent with statements in Defendants' letter opposing damages in the form of legal fees associated with that hearing.  In that letter, Defendants state that the hearing "is a completely separate issue from" and has "absolutely nothing to do with" Plaintiff's longarms.  DE 183 at 2.

Given all of the foregoing information, I respectfully recommend to Judge Spatt that the Plaintiff be awarded $20,000 in emotional distress damages based upon the Defendants' retention of his longarms.

### 2.      Attorney's Fees for Pistol License Hearing

Plaintiff seeks $2,500 in attorney's fees in connection with "preserving his right to sue under the Pistol License Hearing matter."  DE 170 at 2; Tr. at 8.  During his testimony, the Plaintiff confirmed that he paid counsel $2,500 "for the pistol permit return."  Tr. at 120.  Although Plaintiff provides no additional details regarding this claim, the Court assumes Plaintiff is referring to his May 2007 request for a hearing from the Nassau County Pistol License Bureau to secure the return of his handguns and his subsequent request to have the hearing adjourned during the pendency of this case.  *See* DE 164 at 7.  Defendants oppose an award of attorney's fees relating to the pistol license matter on the grounds that: (1) Judge Spatt expressly denied the request for attorney's fees without prejudice to renewal upon the resolution of all of Plaintiff's § 1983 causes of action, including the newly added Fourth Amendment claim; (2) retention of Plaintiff's longarms is a completely separate issue from that raised in a New York State court

Article 78 petition; (3) any claim for attorney's fees related the suspension of Margaret Hartwick's pistol license is totally unrelated to the Plaintiff's claim for damages; and (4) the Defendants should not be held liable for attorney consultations which never resulted in any court filings unrelated to this action. DE 183. This Court recommends that Plaintiff's claim for attorney's fees associated with the state administrative pistol license hearing (which never took place) be denied.

Procedurally, the Court takes note that Judge Spatt previously denied Plaintiff's request for attorney's fees in this action, without prejudice, and with the right to renew upon the resolution of all of Plaintiff's § 1983 causes of action. DE 164 at 28. Consequently, from a procedural perspective, this request for attorney's fees is premature.

From a substantive perspective, on the other hand, the Court finds that an award of attorney's fees is not warranted given the grounds for the application. While 42 U.S.C. § 1988(b) authorizes the award of attorney's fees incurred in an action or proceeding to enforce § 1983, such as the case at bar, attorney's fees are generally not recoverable for related state or administrative law proceedings. "It is well-settled that generally, attorney's fees are not available for work performed in administrative proceedings." *Murray ex rel Murray v. Mills*, 354 F. Supp. 2d 231, 239 (E.D.N.Y. 2005) (citing *Webb v. Board of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 241 (1985)). "Congress only authorized the district courts to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce § 1983." *Id.* (internal quotations omitted). Although there are exceptions to this general rule, such as in situations where the plaintiff was required to exhaust his administrative remedies before bringing the federal lawsuit, Plaintiff has not identified any exception applicable here and the Court is not aware of any. *See*

*Thorsen v. County of Nassau*, No. 03-CV-1022, 2011 WL 1004862, at *4 (E.D.N.Y. March 17, 2011); *accord Murray*, 354 F. Supp. 2d at 239.

 *Murray ex rel Murray v. Mills* is instructive in this regard. *Murray* involved a sex discrimination claim brought by a female student against a Long Island school district because she, unlike her male counterparts, had to pass a physical qualification test in order to participate on the school's baseball team. *Murray*, 354 F. Supp. 2d at 233. The case was eventually settled and in his attorney's fee application, plaintiffs' counsel sought fees for earlier work that was performed on the administrative appeal to the Commissioner of Education. *Id.* at 239. The court observed that "attorney's fees may . . . be awarded for work done in a prior administrative proceeding which 'was both useful and of a type ordinarily necessary to advance' the subsequent civil rights litigation." *Id*. (quoting *N. Carolina Dept. of Transp. v. Crest St. Community Counsel, Inc*., 479 U.S. 6, 15 (1986)). Finding that the plaintiff's § 1983 claim "did not require the Plaintiffs to obtain relief or exhaust their remedies through administrative proceedings," the court noted that the plaintiffs' administrative appeal could not be considered "useful" because the claim failed, thus moving the plaintiff to seek redress in federal court. *Id.* On that basis, the court denied attorney's fees for the hours billed to the administrative appeal.

 Notably, in the instant case, Plaintiff was not required to seek a hearing before the Nassau County Pistol License Bureau prior to filing his federal § 1983 complaint. In fact, Plaintiff requested that the state proceeding be stayed pending the outcome of this litigation. DE 164 at 7. Further, as noted by Judge Spatt, the hearing before the Pistol License Bureau dealt only with Plaintiff's right to possess licensed handguns and not with his ability to possess longarms. *Id.* Since the initial administrative proceeding was not necessary for Plaintiff to

vindicate his constitutional rights, attorney's fees for the administrative proceeding are not appropriate here under § 1988. *See Thorsen*, 2011 WL 1004862, at *4 (declining to award attorney's fees for Article 78 proceeding where it "was not integrally related to nor did it advance his civil rights claims"); *Murray*, 354 F. Supp. at 239 (declining to award attorney's fees for administrative proceeding where "Plaintiffs could have requested a stay of the administrative proceeding and sought immediate relief in state or federal court . . ."); *Vecchia v. Town of North Hempstead*, 927 F. Supp. 579 (E.D.N.Y. 1996) (declining to award attorney's fees for Article 78 proceeding notwithstanding the fact that the federal court remanded the case to the Town for a hearing).

Based upon the particular facts elicited in this case and in light of the applicable case law, I respectfully recommend to Judge Spatt that attorney's fees not be awarded in connection with the consultation between Plaintiff and his counsel regarding the pistol license hearing which, in the end, never took place.

### B.    Punitive Damages

Plaintiff seeks $500,000 in punitive damages. Tr. at 14. Defendants argue that the entire claim for punitive damages should be denied because: (1) punitive damages may not be awarded against a municipality; and (2) there is no evidence that the individual Defendants acted with malice or wrongful motive.

Defendants are correct that punitive damages are generally not available against a municipality in a § 1983 action. *See New Windsor Vol. Ambulance Corps, Inc. v. Meyers,* 442 F.3d 101, 122 (2d Cir. 2006); *Ciraolo v. City of N.Y.*, 216 F.3d 236, 240 (2d Cir. 2000).

Plaintiff's counsel confirmed to the Court that Plaintiff is seeking punitive damages only from the individual Defendants Rocco, Mistretta, and Lemieux. *See* DE 166 ¶ 1.

With respect to the individual Defendants, "[p]unitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir.1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625 (1983)); *accord Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 52 (2d Cir. 2003). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.'" *New Windsor Volunteer Ambulance Corps, Inc.*, 442 F.3d at 121 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538, 119 S. Ct. 2118 (1999)). "Punitive damages are awarded to punish the defendants' unlawful conduct and deter any repetition of such conduct." *Robertson v. Sullivan*, No. 07-CV-1416, 2010 WL 1930658, at *5 (E.D.N.Y. May 12, 2010) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589 (1996)).[5]

Plaintiff has not demonstrated that the individual Defendants' conduct was motivated by evil motive or intent or involved a callous indifference to the federally protected rights of others. Sergeant Mistretta and Police Officer Lemieux both testified that although they were aware that the penal code did not specifically authorize the removal of longarms, they believed they had the authority to remove the longarms pursuant to their general mandate to maintain public safety. Tr. at 218, 290-91. This position is consistent with the testimony of Seargent Richard Snizer, read into the record by Plaintiff's counsel, who stated that although the Police Department did

---

[5]     The Court does not rely on the punitive damages cases cited in Defendants' submissions as they pertain to New York state tort law. *See* DE 171 at 4-5; Defs.' Mem. at 9-11.

not necessarily have the specific legislative authority to confiscate longarms, they thought it was best to err on the side of safety in certain circumstances and that "the legality would eventually evolve in the courts." *Id*. at 198-200. Snizer was clear that the motivation for the policy of retaining longarms was to protect the public. *Id*. at 200-201. He testified that rifles and shotguns became an issue for the Pistol License Section of the Nassau County Police Department as part of a coordination of efforts regarding domestic problems and possible violence. *Id*. at 181-192.

Sergeant Mistretta testified that he was told by Sergeant Haig, the commanding officer of the Pistol License Section that the Plaintiff was involved in an incident in Congresswoman McCarthy's office in Garden City and that Mistretta was to respond to the scene. *Id*. at 218-219. Initially, Sergeant Mistretta reviewed the pistol license incident report from the Garden City Police Department, with the supporting deposition of Mary Ellen Mendelsohn attached. Ms. Mendelsohn was working in Congresswoman McCarthy's Office at the time of the March 19, 2007 incident involving the Plaintiff. *Id*. at 220; *see* Defs.' Ex. D. Sergeant Mistretta also spoke with Detective Samaniego who affirmed the statements in the case report of the Garden City Police Department. *Id*. at 222.

On arriving at the Plaintiff's residence, Sergeant Mistretta and Officer Lemieux observed that the Plaintiff was not at home and so they went down the block to his mother's house. *Id*. at 226, 272. The officers then asked Mrs. Razzano to call the Plaintiff on the phone. *Id*. When she did so, Sergeant Mistretta got on the phone and asked the Plaintiff to meet the officers at his house. *Id*.

Based on Sergeant Mistretta's (1) understanding of the incident at Congresswoman McCarthy's office, (2) observation of the Plaintiff's vehicle which had a life-sized noose hanging

on the back of the vehicle, (3) seeing a sign on the vehicle which said "vote for rope," (4) observation of the sign on plaintiff's property which stated "Name this shame, illegal aliens," (5) interview of the Plaintiff during which the Plaintiff expressed his frustration over the illegal alien issue, (6) observation of a book on white supremacy in the Plaintiff's house, (7) watching Plaintiff's behavior going from laughing to crying during their conversation, and (8) knowledge of the six case reports since 2002 concerning the Plaintiff and the illegal alien issue, Sergeant Mistretta determined that it was proper at that time to remove the weapons from the Plaintiff's house to protect the Plaintiff and to protect the people around him. *Id*. at 231. The same conclusion was reached by Officer Lemieux. *Id*. at 263-264, 277-278.

Both Mistretta and Lemieux denied ever telling the Plaintiff to "cool it" with regard to his political activities. *Id*. at 231, 275. They both further testified that they had no intention to humiliate, retaliate against, or cause injury or harm to the Plaintiff. *Id*. at 231-32, 275-76. Moreover, the officers testified that they were not aware that the retention of Plaintiff's longarms was a violation of his Constitutional rights prior to Judge Spatt's ruling. *Id*. at 239, 281-82. After his investigation was completed, Sergeant Mistretta's recommendation was that the Plaintiff's pistol license should be revoked because of his "mental state of mind." *Id*. at 236. Officer Lemieux testified that the information the officers had, in addition to their observations, called into question the Plaintiff's mental stability. *Id*. at 291.

There was also testimony that neither Mistretta nor Lemieux were involved in the retention of Plaintiff's longarms beyond the initial seizure. *Id*. at 238, 280-81. Sergeant Mistretta testified as follows:

> Q.     . . . after you finished your investigation and made your recommendation to Sgt. Haig, what part if any did you have in the department's retention of Razzano's longarms?
>
> A.     We have no involvement with the longarms at all.
>
> Q.     Was it your decision to retain Razzano's longarms without providing a prompt hearing?
>
> A.     No.
>
> Q.     Whose responsibility is it in the police department to deal with the retention of longarms?
>
> A.     The Property Bureau holds onto the longarms, and they hold onto them until someone requests for them to be returned to them.
>
> Q.     And any other department in the police department that deals with the restoration, when the restoration of the longarms?
>
> A.     When the longarms are taken, the command that took the longarms would be involved in the return of the longarms.
>
> Q.     And you were not  -- which command, regarding Mr. Razzano in Freeport, which command is that?
>
> A.     That would be the Freeport Police Department.
>
> *     *     *     *
>
> Q.     Now, were you ever made aware before February 2011 that the department's policy of retaining longarms without providing a hearing violated the Constitution?
>
> A.     No.

Q.      Were you ever made aware before February 2011 by any person in the police department that the department's policy of retaining longarms without providing a hearing violated the Constitution?

A.      No.

                              *     *     *     *

Q.      Did you ever receive any training indicating that in retaining the longarms without providing a prompt post-deprivation hearing, the department was violating the United States Constitution?

A.      No.

*Id*. at 238-40.  Police Officer Lemieux also confirmed that longarms were held in the Property Bureau and that an individual seeking their return would communicate through the Legal Bureau. *Id*. at 281.  Although the officers' testimony was not entirely consistent regarding who was responsible for the retention of Plaintiffs' longarms after they were confiscated, they were, however, clear that after the initial confiscation, their involvement in the retention of Plaintiff's longarms ended.  *Id.* at 238, 281.  Given that it is the retention, not the initial seizure, which is at issue here, this testimony is particularly important.

The other individual Defendant, retired Chief of Department Anthony Rocco, was even less involved than Mistretta and Lemieux.  He testified that while he was on active duty, his limited role with respect to pistol licenses involved reviewing interim revocations of pistol licenses to ensure that the revocation complied with departmental policy.  *Id*. at 297-98. Defendant Rocco's connection with this case is that he reviewed the interim revocation of Plaintiff's pistol license and determined that the interim revocation was appropriate given the information he had in his possession.  *Id*. at 309-11.  His involvement with the matter ended on May 21, 2007 when he sent the Plaintiff a letter in response to Plaintiff's request for an

administrative hearing stating that the matter was being referred to the Legal Bureau. *See* Defs.'

Ex. J. Rocco had no involvement in the decision to retain Plaintiff's longarms. Tr. at 318, 335.

In sum, there is no evidence that any of the individual Defendants acted with evil motive

or intent or with reckless or callous disregard for Plaintiff's rights. In taking the actions they did

with respect to Plaintiff's longarms, as Judge Spatt previously ruled, the individual Defendants

acted in accordance with the then policy of the Department. DE 164 at 16. Notably, none of the

individual Defendants was involved in formulating the policy that led to the retention of

Plaintiff's longarms. Plaintiff's attempt to seek punitive damages from the individual

Defendants, perhaps because of his inability to obtain such damages from the County, is

unavailing. Tr. at 239, 282-83, 319-20.

Plaintiff makes a number of arguments with respect to his entitlement to punitive

damages, none of which the Court finds persuasive. First, Plaintiff argues that punitive damages

are warranted because Defendants engaged in a pattern or practice of grossly disregarding the

rights of "thousands of others." DE 170 at 3. There was no evidence introduced regarding the

"thousands of others," and even if there were, the fact that other individuals were treated in the

same way as Plaintiff does not prove that the individual Defendants acted with the requisite evil

motive or reckless disregard. Plaintiff further argues that Defendants knew their actions were

inappropriate because the New York Supreme Court, Appellate Division, Second Department, in

an unrelated case, *Caso v. Nassau County Police Deptartment*, 306 A.D.2d 473, 761 N.Y.S.2d

303 (2d Dep't 2003), had previously ordered Nassau County "to set up a procedure that afforded

due process to individuals seeking the return of their longarms . . . ." DE 170 at 3; *see* Pl's.

Mem. at 5. Defendants Mistretta and Lemieux, however, testified that they had no knowledge of

the illegality of the retention of Plaintiff's longarms until Judge Spatt's February 28, 2011 decision. Defendant Rocco specifically testified that he never heard of the *Caso* case. Tr. at 323. Moreover, contrary to Plaintiff's description of the case, the holding of *Caso* is narrow. There, the petitioner was entitled to a hearing to determine his suitability to possess his seized rifles and shotgun. There was no determination regarding the legality of the Department's policy with respect to longarms in general.

Finally, Plaintiff argues that punitive damages are necessary to prevent Defendants from resorting to their improper conduct. DE 170 at 4. Plaintiff is correct that the purpose of punitive damages is to deter the repetition of unlawful conduct, *see Robertson*, 2010 WL 1930658, at *5, but Plaintiff's belief that the Defendants may commit unlawful conduct in the future does not absolve the Plaintiff of his burden to establish the intent elements necessary to justify a punitive damages award in these circumstances.[6]

---

[6]     In support of the argument that the unlawful longarm retention practices continue at the Nassau County Police Department, the Plaintiff attempted to call Hank Wrobel, an individual from Port Washington, New York (within Nassau County) to testify. Mr. Wrobel is not a party to this action nor did he observe any of the underlying facts of this case. He was being offered to present testimony about his own experience with the Nassau County Police Department concerning his longarms being retained. *Id*. at 213, 214. Apparently, in December of 2004, the Nassau County Police Department seized Wrobel's pistols, longarms and air guns pursuant to an investigation involving the discharge of one of his handguns by his teenage son. *See* Pl's. Ex. 57 ¶¶ 2, 3 (not admitted into evidence and provided here solely for context). The Court declined to permit Mr. Wrobel's testimony, finding that the only damages relevant to the hearing were Plaintiff Razzano's and that the proffer added nothing in support of the claim for emotional distress damages based upon the retention of Plaintiff's longarms. Tr. at 214.

## IV.    CONCLUSION

For all of the foregoing reasons, I respectfully recommend to Judge Spatt that Plaintiff be awarded compensatory damages in the amount of $20,000 and that no punitive damages be awarded.  I further recommend that Plaintiff be awarded post-judgment interest at the rate set forth in 28 U.S.C. § 1961 as of the date of the entry of final judgment.  Finally, I recommend that the Plaintiff not be awarded the $2500 in attorney's fees as requested for the consultation or any work done by counsel regarding the pistol license hearing issue.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) and (e).   Such objections shall be filed with the Clerk of the Court via ECF.  A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Arthur D. Spatt, and to the chambers of the undersigned.  Any requests for an extension of time for filing objections must be directed to Judge Spatt prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Central Islip, New York
      February 27, 2012

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge
